UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KRISTEN SCHULTE,

                    Plaintiff,

        – against –

IBM CORPORATION,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ECF**

**COMPLAINT AND**
**JURY DEMAND**

CASE NO. _____

Plaintiff Kristen Schulte ("Plaintiff"), by her attorneys, Sapir Schragin LLP, alleges as and for her Complaint, as follows:

## NATURE OF CLAIMS

1.      Plaintiff, a female executive, brings this Complaint against IBM Corporation ("IBM") alleging that she was unlawfully discriminated against based upon her sex, on an ongoing and continuing basis, both during her employment and in the decision to terminate her employment for failure to close a sale, despite having made one of the largest stand-alone sales of Watson Cognitive, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.* and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq.*

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the First Claim, pursuant to 28 U.S.C. § 1331, because the claims are brought pursuant to a federal statute, Title VII.

3.      This Court has supplemental subject matter jurisdiction over the Second and Third Claims, pursuant to 28 U.S.C. § 1367, because they arise out of the same set of facts and circumstances as the First Claim and the New York State and New York City law claims are so closely related to Plaintiff's federal claims as to form the same case or controversy under Article III of the United States Constitution.

4.      Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as Plaintiff is a citizen of Kentucky, Defendant corporation is incorporated under the laws of New York and maintains its principle place of business in New York, and the matter in controversy exceeds $75,000, exclusive of interests and costs.

5.      Venue is proper in the Southern District of New York pursuant to 42 U.S.C. § 2000e-5(f)(3) because the discrimination occurred in Defendant's division of IBM for which Plaintiff worked, located in offices in New York, New York, which is within New York County, and Yorktown Heights, New York, which is within Westchester County, both counties being within the Southern District of New York; employment records relevant to this action are located in Defendant's division of IBM for which Plaintiff worked, located in offices in New York, New York, which is within New York County, and Yorktown Heights, New York, which is within Westchester County, both counties being within the Southern District of New York; and, but for the discrimination, Plaintiff would have worked in, or telecommuting into, Defendant's division of IBM located in offices in New York, New York, which is within New York County, and Yorktown Heights, New York, which is within Westchester County, both counties being within the Southern District of New York.

6.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

2

1391 because Defendant's principal place of business is Armonk, New York, located in Westchester County, and Defendant's division of IBM for which Plaintiff worked was located in offices in New York, New York, which is within New York County, and Yorktown Heights, New York, which is within Westchester County, both counties being within the Southern District of New York; defendant operates within both Westchester and New York Counties, which are within the Southern District of New York; at all relevant times Plaintiff worked for Defendant in, or telecommuting into, the New York, New York offices, located in New York County, or the Yorktown Heights, New York office, located in Westchester County, both of which are located within the Southern District of New York; and the discriminatory acts occurred within this District.

7.      Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on November 4, 2015, within 300 days of Defendant's last discriminatory act against Plaintiff, alleging that she was discriminated against based upon sex, in violation of Title VII and NYSHRL.

8.      The EEOC issued a Notice of Right to Sue Letter and this suit has been filed in a timely manner.

## THE PARTIES

9.      At all relevant times, Plaintiff was an employee in Defendant's Watson Transformations Group, currently located at 51 Astor Place, New York, New York.  Plaintiff performed her duties in the 51 Astor Place, New York, New York office, the 590 Madison Avenue, New York, New York office, the 63 Madison Avenue, New York, New York office, and the Research Center in Yorktown Heights, New York and from other remote locations.

3

10. Defendant IBM's principal place of business is located at 1 New Orchard Road, Armonk, New York. IBM is an information technology company, providing products and services, with employees and offices located globally.

11. At all relevant times, Defendant was a covered employer within the meaning of Title VII, the NYSHRL, and the NYCHRL.

## FACTUAL ALLEGATIONS

12. Plaintiff, a highly-educated woman working in the information technology field, was hired as an executive-level Partner in Defendant's new Watson Transformations Group. Plaintiff was employed by Defendant from on or about June 2, 2014 until on or about April 30, 2015.

13. Upon information and belief, males dominate the executive levels of the company and the Group in which Plaintiff worked. During Plaintiff's employment, the ratio of gender disparity among Vice Presidents, including the General Manager, in the Watson Transformations Group increased from five men and one woman to seven men and one woman. Partners worked for, and one level below, the Vice Presidents and the General Manager. The disparity among executives at Plaintiff's level also increased as only men were hired or transferred in as Partners, subsequent to Plaintiff's hiring. When Defendant terminated Plaintiff's employment, there were ten men to the four women Partners.

14. Between Plaintiff's hiring and the termination of her employment, Defendant did not treat Plaintiff the same or provide her the same support as the male Partners in the Watson Transformations Group.

4

15.     Upon information and belief, Defendant provided male Partners: access to essential support such as supervisors, the company's business client contacts, and the internal sales system used to identify sales opportunities and record sales "activity"; experienced staff; assignment to "qualified" (vetted) client accounts and assistance in the sales process; the ability to focus on the same business sector for an extended sales cycle without being reassigned and restarting the cycle of time from client contact to sales closure; evaluations based on known performance metrics and facts not skewed by a discriminatory animus; flexible deadlines and extensions for closing sales; an annual bonus irrespective of sales; and continued employment after being unable to close sales.

16.     Plaintiff's first supervisor refused to meet with Plaintiff for weeks after learning she had been assigned to his team. He denied Plaintiff access to the company's client contacts and the internal sales system for six weeks and failed to explain the critical need for her to record her sales "activity," along with actual sales, in the sales system.   He imposed a single, inexperienced assistant, who required training and mentoring, upon Plaintiff.   He assigned Plaintiff to unqualified accounts, while offering her male counterparts "qualified" accounts, and did not assist her in the sales process.  He assigned her to multiple low-priority business sectors then had her removed from his team, requiring her to restart the sales cycle with new clients in yet another sector. He told her only that she needed to sell and did not provide her performance objectives or any information on how she would be evaluated.  Her annual evaluation was further tainted by his discriminatory treatment against her on the basis of sex and, upon information and belief, his making negative comments about Plaintiff, because of her sex, to the General Manager.  His sexually discriminatory treatment followed Plaintiff after she was assigned to

5

another team and the result was that Plaintiff was denied flexible deadlines for closing sales, denied the annual bonus, and denied her continued employment after she closed a sale.

17.    Defendant terminated Plaintiff's employment two weeks after she closed one of the largest stand-alone sales ever accomplished within Watson Transformations Group, and not as an add-on to a larger sale by one of Defendant's other business groups.

18.    Upon information and belief, male Partners who did not close a sale as large as Plaintiff's, or even assist in the closure of a large sale, were not terminated.

19.    Upon information and belief, the particular type of sale Plaintiff accomplished was one of only a few like it and Plaintiff was the only woman to accomplish this particular type of sale.  Neither of Plaintiff's two male supervisors, nor her male counterparts, had led this type of sale to closure.

20.    Plaintiff began her employment with Defendant after being recruited by the General Manager of the Watson Transformations Group.  The General Manager placed Plaintiff under the Vice President of the Cross-Industry Team, where Plaintiff focused on business relationships first in the Industrial sector and then in the Media and Entertainment sector.

21.    Plaintiff's job was to further develop Defendant's existing business relationships, paving the way for sales of a major information technology product (Watson Cognitive) or, as a lesser alternative, information technology services (Cognitive Value Assessments) which could be used as an introduction to the larger Watson Cognitive product.

22.    Upon information and belief, the General Manager and the Vice President of the Cross-Industry Team had a long-standing, close professional and social relationship.

23.    Plaintiff was the first female Partner the General Manager had assigned to this

6

Vice President and the only female Partner this Vice President had on his team.

24.     The Vice President of the Cross-Industry Team, Plaintiff's first supervisor, completely ignored Plaintiff and did nothing to support her.

25.     He refused to meet with Plaintiff for weeks after she began working for him, even though she made multiple requests to meet with him about her individual objectives, information on how those objectives would be measured, and to generally learn how things worked within the company.

26.     He failed to explain to Plaintiff basic information she needed to do her job, such as how to gain access to client accounts, how to work with other business groups inside the company to gain access to their client contacts, and how the company managed its sales cycles.

27.     Upon information and belief, the Vice President of the Cross-Industry Team supported the male Partners, met with the male Partners when requested to do so, and met with the male Partners during the weeks Plaintiff sought a meeting.  He also explained to the male Partners their individual objectives, how those objectives would be measured, and how things worked within the company.  And, he explained to the male Partners how to gain access to client accounts, how to work with other business groups inside the company to gain access to their client contacts, and how the company managed its sales cycles.

28.     Upon information and belief, Defendant advised Plaintiff that when she began employment she would have access to Defendant's clients and sales opportunities, through both the internal sales system and her supervisor's ability to connect her with the company's other client account teams so that she could begin to develop business relationships with existing clients.

7

29.     For the first six weeks of Plaintiff's employment, the Vice President of the Cross-Industry Team repeatedly refused Plaintiff access to the company's internal sales system despite Plaintiff's multiple requests for access and he did not connect her with other client account teams.  Plaintiff's ability to develop Defendant's existing business relationships and begin the sales cycle for her initial sector was severely obstructed.

30.     Upon information and belief, Defendant granted male Partners access to the company's internal sales system upon hiring (or they already had access because they transferred in from another one of Defendant's business groups) and their supervisors connected them to client account teams, thereby allowing the men to begin their sales cycle upon employment in the Watson Transformations Group.

31.     Plaintiff was not provided experienced staff to assist her.  She identified and tracked her own potential sales opportunities.  She generated sales "activity," but was not made aware of the need to document it in the sales system for purposes of her performance evaluation or annual bonus.  And, she was required to create her own complex presentations.

32.     Upon information and belief, male Partners were provided experienced staff to assist them.  Male Partners had experienced staff to identify and track potential sales opportunities.  They had experienced staff to assist in documenting sales "activity."  And, they had experienced staff to create complex presentations.

33.     Plaintiff's first supervisor assigned her low-priority or unqualified accounts that had little chance of finalizing a sale of the product or related services and did not assist her in the sales process.

34.     Upon information and belief, Plaintiff's first supervisor assigned the male

8

Partners "qualified" accounts, included their names on other "qualified" accounts led and managed by other individuals or business groups thereby broadening their sales "activity" and visibility, and assisted them with the sales process.

35.     Plaintiff was assigned to multiple business sectors by her first supervisor, and eventually he transferred Plaintiff to another team under a different Vice President, both of which required her to refocus her sales efforts on different sectors and begin new sales cycles with new contacts.

36.     Male Partners were not transferred nor required to refocus their sales effort on different sectors, which allowed the clock on their sales cycles to continue without interruption.

37.     Upon information and belief, Defendant permitted the Watson Transformations Group to assess executive performance and award a bonus based on Partners' performance objectives and sales "activity" levels.  Instead of actual sales, the sales "activity" was tracked by the Watson Transformations Group because the Watson Cognitive product was not ready for market and the Group was severely lacking in sales.  Circumventing company-wide policies and procedures for documenting sales via standard sales reports and evaluating employees using standard evaluation policies, the Group's General Manager and Vice Presidents relied on the "activity" levels and the visibility, or perception, of Partners' work to assess performance; so long as a Partner interacted in any way with a business client, the Partner would receive credit for "activity" irrespective of whether a sale was actually made.

38.     Upon information and belief, Vice Presidents in the Watson Transformations Group established a pattern and practice of supporting and promoting Partners' sales "activity" by: adding their names, or telling them to add their names, into the sales system; adding their

9

names, or telling them to add their names, to as many documents as possible that were associated with a potential sale; encouraging Partners to join meetings or conference calls and then adding their names, or telling them to add their names, in the sales system to document this as "activity"; and by mentioning the Partners' names in regular meetings with the General Manager to promote the visibility, or perception, of sales "activity" by the Partners. The sales "activity" level of Partners was then discussed between the Vice Presidents and the General Manager at the time of the performance evaluations and when the bonus was to be paid to Partners.

39.     Plaintiff was not informed of the "activity" method of assessing performance and paying the bonus, Plaintiff's sales "activity" and visibility, or perception, were not supported, and Plaintiff was not paid her 2014 bonus.

40.     Plaintiff's first supervisor failed to inform Plaintiff of the sales "activity" method for assessing performance and paying the bonus. In fact, he strictly forbade Plaintiff from doing anything in the company's sales system without his prior approval. Plaintiff did not learn of the sales "activity" method for assessing performance and paying the annual bonus for approximately the first five months of her employment.

41.     Plaintiff was not provided with the individual objectives she was required to meet for performance and for payment of the bonus, was not instructed on the need to prove "activity," was not instructed on how to prove "activity" until the last month or so of the fiscal year, did not have her name added to documents to prove "activity," and, upon information and belief, did not have the benefit of her supervisors communicating her "activity" in meetings with the General Manager and other Vice Presidents.

42.     Upon information and belief, male Partners were provided individual objectives

10

they were required to meet for performance and for payment of the bonus, were either informed that they should insure their names were added to the sales system and documentation for even minimal sales "activity" or their supervising Vice President encouraged the male Partners to join meetings and conference calls and then added the male Partners' names to the sales system or documentation for minimal sales "activity," and their supervising Vice President mentioned male Partners' "activity" in meetings with the General Manager.   Defendant then paid the male Partners their 2014 bonus, irrespective of whether the male Partners made actual sales.

43.   The discriminatory animus of the Vice President of the Cross-Industry Team caused Plaintiff to lose approximately five months of time in which she could have documented her sales "activity."

44.   Defendant provided Plaintiff with an annual performance evaluation for 2014. During that evaluation, held on or about January 27, 2015, Defendant notified Plaintiff that her performance evaluation status was "On Notice" and that Plaintiff had approximately thirty days to achieve a "Pass" status.  Upon information and belief, Plaintiff was evaluated on a three-tiered ranking system that provided for a ranking of either "Pass," "On Notice," or "Fail."

45.   Defendant notified Plaintiff that in order to achieve a "Pass" status on her annual evaluation, she needed to "close at least one significant business opportunity before the end of February" and "demonstrate leadership and communication skills appropriate of an executive within Watson Group to drive the close process above to [sic] speed."

46.   Upon information and belief, based on Plaintiff's experience in the information technology field, the sales lead time needed to close a sale in the field is six months to one year, or longer.  While Watson Transformations Group was able to sell Cognitive Value Assessments

11

in 2014, the Group was unable to sell the Watson Cognitive product as a stand-alone sale. Watson Cognitive product sales were made by Defendant's other business groups, as an add-on product in much larger deals, but not as an individual product sold solely by the Watson Transformations Group.  Plaintiff understood, upon information and belief, that it was highly unlikely a sale would close in less than six months.

47.     When Defendant notified Plaintiff in her evaluation that she had the arbitrary one-month deadline at the end of February to close "a significant business opportunity," Defendant was already aware that Plaintiff was on track to close one of the largest, stand-alone Watson Cognitive sales by March 31, 2015.

48.     At about the same time Plaintiff was placed "On Notice," she was notified by Defendant's product development group that the Watson Cognitive product was not ready for market.  Her large sale that was about to close was, therefore, in jeopardy of not closing.

49.     Upon information and belief, Defendant knew the product was not ready for market when giving Plaintiff a one-month deadline to close a sale and then refusing to extend the sales deadline for Plaintiff.

50.     Upon information and belief, Defendant did not place male Partners "On Notice" with an arbitrary one-month deadline for closing a sale, especially when knowing that they were likely to close a large sale.  Defendant also extended sales deadlines for male Partners after knowing the male Partners would not meet the deadlines.

51.     Upon information and belief, Defendant was unable to explain Plaintiff's other performance evaluation requirement that she lead and communicate "to drive the close process." Defendant was also unable to clarify how Plaintiff should meet this requirement.

12

52.     Plaintiff's annual performance evaluation was based on information provided by her first supervisor, the Vice President of the Cross-Industry Team, who had hampered her successful performance based on his discriminatory treatment of her on the basis of sex.

53.     Upon information and belief, after Plaintiff was placed on the Cross-Industry team, the Vice President of the Cross-Industry Team made negative and derogatory comments about Plaintiff because of her sex, some or all of which were false and misleading, to the General Manager.  Upon information and belief, the Vice President did not communicated his own actions, of sex discrimination and obstruction of Plaintiff's ability to successfully perform, to the General Manager.

54.     Upon information and belief, Plaintiff's evaluation was written by the Vice President of the Financial Services Team.  It contained factual inaccuracies because of the sexually discriminatory treatment Plaintiff had received from the Vice President of the Cross-Industry Team, which influenced the comments made by the Vice President of Financial Services.  For example, the evaluation states Plaintiff spent nine months on the Cross-Industry Team and "struggled to get traction and drive business."  Plaintiff spent just over three months on the Cross-Industry Team and her Vice President spent the first six weeks subjecting Plaintiff to sexually biased treatment, preventing her access to the information she needed to "get traction" or "drive business," and not providing her viable sales opportunities as he did the male Partners.

55.     Upon information and belief, Defendant circumvented its own policies and procedures in the handling of Plaintiff's evaluation and in her termination.  Defendant did not provide Plaintiff notice of her job duties and objectives, made no effort to provide feedback or

13

make Plaintiff successful, and provided Plaintiff no opportunity to respond to derogatory comments made by the Vice President of the Cross-Industry Team to the General Manager. Defendant claimed Plaintiff was not meeting objectives, then did not offer a performance improvement plan or follow procedures consistent with one.

56.     Upon information and belief, Defendant maintains company policies and procedures regarding job descriptions and duties, performance measurement criteria, performance improvement plans, and terminations.

57.     Plaintiff asked the Vice President of the Financial Services Team if the "On Notice" status and the February sales deadline were part of a performance improvement plan and asked what would happen after the February deadline, knowing that her Watson Cognitive sale would not close until the end of March. Plaintiff also requested an extended deadline given the fact that she had only begun her work on a sales cycle for the Financial Services team approximately four months prior. Finally, Plaintiff asked for further explanation about how she was not properly leading or communicating to drive sales closures.

58.     The Vice President of Financial Services provided no response to any specific questions. Instead, he just told Plaintiff she should keep working on her sales.

59.     Plaintiff continued to work toward closing sales and communicating with colleagues and clients. She contacted the Vice President of Financial Services weekly to provide progress updates, request feedback, and to continue to ask what was going to happen at the end of February.

60.     Plaintiff was told by the Vice President of Financial Services that she was making progress.

14

61.     Plaintiff entered information into the internal sales system and the close plan database that her large sale was tracking to close on or about March 31, 2015.

62.     On or about March 16, 2015, the Vice President of Financial Services notified Plaintiff that Defendant was terminating Plaintiff's employment effective April 15, 2015.

63.     On or about March 31, 2015, the contract for Plaintiff's sale was executed by the business client, making it one of the largest Watson Cognitive sales ever made solely by the Watson Transformations Group.

64.     Plaintiff made an internal complaint of discrimination, which was investigated by another employee of Defendant and summarily dismissed.

65.     Defendant terminated Plaintiff's employment shortly thereafter.

66.     Upon information and belief, Defendant held Plaintiff to higher standards than male Partners in the Watson Transformations Groups and when Plaintiff still managed to close a large sale within these standards, Defendant terminated her.  Male Partners had lower standards, failed to close sales, and were not terminated.


## AS AND FOR A FIRST CAUSE OF ACTION
### *(Discrimination Based Upon Sex in Violation of Title VII)*

67.     Plaintiff repeats and re-alleges each allegation contained in paragraphs 1 through 66 of the Complaint, as though fully set forth herein.

68.     On a continuing and ongoing basis throughout Plaintiff's employment, Defendant unlawfully discriminated against Plaintiff, on the basis of her sex, in violation of Title VII of the Civil Rights Act through the preferential treatment of male Partners by not terminating them

15

after closing a sale, but terminating Plaintiff after she closed a sale; by providing male Partners access to their supervisors, the company's business client contacts, the internal sales systems, and a staff of experienced personnel, but not to the Plaintiff; by assigning "qualified" accounts, sales "activity" credit, and bonuses to the male Partners while denying Plaintiff the same; by not requiring male Partners to transfer to new sectors and sales relationships with little to no notice, as required of Plaintiff; by providing Plaintiff a performance evaluation and rating based on incorrect facts and discriminatory basis, with an arbitrary deadline, but not doing the same to male Partners; by extending sales deadlines for male Partners, but not Plaintiff.; and by providing male Partners continued employment when they did not close sales but terminating Plaintiff after she closed a significant sale.

69.     As a result of Defendant's discrimination, Plaintiff has and continues to suffer lost wages, lost employment and career opportunities, lost employment benefits, other pecuniary damages and lost privileges of employment, and has incurred and will continue to incur attorney's fees and costs in the prosecution of her claims.

70.     As a result of Defendant's discrimination, Plaintiff suffered and continues to suffer emotional distress, pain and suffering, and physical and mental anguish.

71.     Defendant's unlawful conduct was willful, wanton, and egregious and Plaintiff is entitled to punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### *(Discrimination Based Upon Sex in Violation of the New York State Human Rights Law)*

72.     Plaintiff repeats and re-alleges each allegation contained in paragraphs 1 through

16

66 of the Complaint, as though fully set forth herein.

73.     On a continuing and ongoing basis throughout Plaintiff's employment, Defendant unlawfully discriminated against Plaintiff, on the basis of her sex, in violation of the New York State Human Rights Law through the preferential treatment of male Partners by not terminating them after closing a sale, but terminating Plaintiff after she closed a sale; by providing male Partners access to their supervisors, the company's business client contacts, the internal sales systems, and a staff of experienced personnel, but not to the Plaintiff; by assigning "qualified" accounts, sales "activity" credit, and bonuses to the male Partners while denying Plaintiff the same; by not requiring male Partners to transfer to new sectors and sales relationships with little to no notice, as required of Plaintiff; by providing Plaintiff a performance evaluation and rating based on incorrect facts and discriminatory basis, with an arbitrary deadline, but not doing the same to male Partners; by extending sales deadlines for male Partners, but not Plaintiff.; and by providing male Partners continued employment when they did not close sales but terminating Plaintiff after she closed a significant sale.

74.     As a result of Defendant's discrimination, Plaintiff has and continues to suffer lost wages, lost employment and career opportunities, lost employment benefits, other pecuniary damages and lost privileges of employment.

75.     As a result of Defendant's discrimination, Plaintiff suffered and continues to suffer emotional distress, pain and suffering, and physical and mental anguish.

## AS AND FOR A THIRD CAUSE OF ACTION
### *(Discrimination Based Upon Sex in Violation of*
### *the New York City Human Rights Law )*

76.     Plaintiff repeats and re-alleges each allegation contained in paragraphs 1 through 66 of the Complaint, as though fully set forth herein.

77.     On a continuing and ongoing basis throughout Plaintiff's employment, Defendant unlawfully discriminated against Plaintiff, on the basis of her sex, in violation of in violation of the New York City Human Rights Law through the preferential treatment of male Partners by not terminating them after closing a sale, but terminating Plaintiff after she closed a sale; by providing male Partners access to their supervisors, the company's business client contacts, the internal sales systems, and a staff of experienced personnel, but not to the Plaintiff; by assigning "qualified" accounts, sales "activity" credit, and bonuses to the male Partners while denying Plaintiff the same; by not requiring male Partners to transfer to new sectors and sales relationships with little to no notice, as required of Plaintiff; by providing Plaintiff a performance evaluation and rating based on incorrect facts and discriminatory basis, with an arbitrary deadline, but not doing the same to male Partners; by extending sales deadlines for male Partners, but not Plaintiff.; and by providing male Partners continued employment when they did not close sales but terminating Plaintiff after she closed a significant sale.

78.     As a result of Defendant's discrimination, Plaintiff has and continues to suffer lost wages, lost employment and career opportunities, lost employment benefits, other pecuniary damages and lost privileges of employment, and has incurred and will continue to incur attorney's fees and costs in the prosecution of her claims.

79.     As a result of Defendant's discrimination, Plaintiff suffered and continues to

18

suffer emotional distress, pain and suffering, and physical and mental anguish.

80.    Defendant's unlawful conduct was willful, wanton, and egregious and Plaintiff is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

A.    Declare Defendant's discriminatory conduct complained of herein to be a violation of Plaintiff's rights under Title VII, the NYSHRL, and the NYCHRL.

B.    Award Plaintiff damages for all compensation, benefits, and lost opportunities of employment that Plaintiff would have been entitled to receive had Defendant not unlawfully terminated her employment, including but not limited to back pay, lost benefits, front pay, and pre-judgment and post-judgment interest on all sums awarded to Plaintiff;

C.    Award Plaintiff compensatory damages for emotional distress, pain and suffering, and mental anguish;

D.    Reinstate Plaintiff to employment with Defendant with the position, title, seniority, compensation, benefits, and privileges of employment that she would have had if she had not been discriminated against and her employment had not been terminated;

E.    Award Plaintiff punitive damages;

F.    Award Plaintiff damages for any additional taxes incurred by her due to Defendant's unlawful conduct;

G.    Award Plaintiff her reasonable attorney's fees and costs in this action, and pre-

judgment and post-judgment interest on all sums awarded to Plaintiff; and

      H.     Award such other and further relief as the Court deems just and proper.


## JURY DEMAND

      Plaintiff demands trial by jury of all issues in this action properly triable before a jury.


Dated:  White Plains, New York            Yours, etc.,
        November 3, 2016

                                       **SAPIR SCHRAGIN LLP**

                                By: _____
                                   Donald L. Sapir
                                   Howard Schragin
                                   Kelly Jines
                                   399 Knollwood Road, Suite 310
                                   White Plains, New York 10603
                                   (914) 328-0366
                                   *Attorneys for Plaintiffs*

20